## CIRCUIT COURT OF THE CITY OF WINCHESTER

In re Paul Hampton Thomson

March 12, 1986

By JUDGE HENRY H. WHITING

The Court has heard evidence and argument on March 11, 1986, considered the memoranda filed, and the following is its opinion in this case involving a contempt proceeding against Mr. Thomson for failing to appear as counsel at a scheduled trial involving the termination of residual parental rights of his client in her child.

The file in that case shows that the child had been in the custody of the Winchester Department of Social Services since June 22, 1983; that case was originally set for termination of parental rights in the Juvenile and Domestic Relations District Court on June 19, 1985, and counsel notified by letter on June 3, 1985. A number of witnesses were summoned for that hearing, but it was continued on motion by Mr. Thomson filed June 11, 1985, to give him time to prepare for trial. The matter was finally set for trial in the Juvenile and Domestic Relations District Court on September 23, 1985, the rights terminated September 26, 1985, and the appeal filed October 4, 1985. At the next Motions Day, October 22nd, this Court advised counsel of the urgency of hearing this kind of matter involving children as soon as possible, and no one objected to its being set November 11, 1985. Witnesses were summoned for that day, and the Court, all counsel and parties but the mother and her counsel, Mr. Thomson, were present ready to proceed.

An affidavit filed by Mr. Thomson indicates the following.

Mr. Thomson personally was retained by Mrs. Brinklow's mother to represent Mrs. Brinklow but was not Mrs. Brink-

low's attorney on appeal, since she did not pay his retainer for the appeal but was praeciped for the October Motions Day for the setting of the case. He did not appear that morning when opposing counsel, Thomas Louthan, appeared to have the case set, and it was set on November 11, 1985, Veterans Day. Later that day, in another matter, he explained to the Judge why he had not appeared but said he would be willing to be appointed as her counsel. The court did not appoint him at this time but said he would do so on the day of trial. Mr. Thomson noted that the date was a holiday, but the Court explained the reason for urgency and confirmed the trial date. On Thursday, November 7, Mr. Thomson asked Mr. Louthan if he would agree to a continuance, and Mr. Louthan said there was no objection, and Mr. Thomson told him he would get back with Mr. Louthan later. During this conversation, they agreed to stipulate the expert testimony. On Friday Mr. Thomson was told by Mrs. Brinklow that she wanted to proceed with the trial, and he told her to be present in court on the following Monday at 9:00 a.m. On Saturday he finally decided to attend the seminar and talked to Mr. Massie, who agreed to handle all pending cases.

Mr. Thomson says he discussed the Brinklow case with Mr. Massie in detail, explaining that it was a hopeless case and that he had spent a substantial part of the week in an attempt to review the facts and evidence for anything which could arguably be presented to a Court on her behalf, and that since Mrs. Brinklow's expert was against her, he was not going to use her but would only have Mrs. Brinklow testify. He advised Mr. Massie that Mr. Louthan had agreed to a continuance and he, Mr. Thomson, saw no problem in having the matter continued by agreement, but if the arrangement was not agreeable to the Court, Mr. Massie would have no problem trying the case because of his thirty years of trial experience and no issues to develop or contest in the Brinklow matter, and he says he told Mr. Massie to telephone Mr. Louthan and the guardian *ad litem* and arrange for a continuance promptly. Also, Mr. Thomson says he considered calling the Judge but the number was unlisted. In the outline of things for Mr. Massie to do, he instructed Mr. Massie to telephone Mr. Louthan and Miss Brumback immediately, and Mr. Massie "assured Mr. Thomson he would handle all of his matters and advised

him not to worry." Mr. Thomson had left for the seminar confident that Mr. Massie could substitute for him "as his associate in accordance with local practice" and with no thought of disrespect or inconvenience to the Judge.

Mr. Massie met with the Judge in chambers, asked for a continuance, the Court denied it, and then Mr. Massie said he would take the case and represent Mrs. Brinklow, but the Judge advised him not to try the case because Mrs. Brinklow was unstable and might sue him, and Mr. Massie further said he did not know much about the case other than what Mr. Thomson told him. When they got in Court, Mr. Louthan said Mr. Thomson had mentioned a continuance but did not get back in touch with him as he said he would. The affidavit concludes by saying he was acting in good faith and with no intent to show any contempt or disrespect and confirming the apology.

The affidavit filed by Mr. Massie confirms the statement of facts to the extent of his agreement to handle the case, Mr. Thomson's review of the case and request to appear and file a motion for a continuance and, if the continuance was not granted, to move to be appointed in Mr. Thomson's place. The affidavit then says this:

> The Court inquired if he was familiar with the case, and he replied he was not very familiar with it, to which the Court replied that it might be risky for him to do so because of what Mrs. Brinklow might think and do if the case was decided against her, to which Affiant concurred and was not appointed.

When the evidence was heard on March 11, 1986, additional facts were brought out as hereinafter set forth.

The following Virginia cases are relied upon in the first memorandum filed for Mr. Thomson.

*Wise's Case*, 97 Va. 779 (1891), was one in which the lawyer scheduled a case for trial in the police court in Richmond at 10:00 in the morning when he already had a case scheduled in the county court in Richmond at 11:00. The Court found that he made this scheduling in good faith and in the reasonable expectation that he would finish the first case in time to begin the trial of the second case, and therefore, there could be no contempt of the

second court in failing to keep the appointment when he notified the judge by contacting the opposing counsel in advance of his dilemma, especially when the first judge refused to stop the trial to permit him to attend the second case. As the Supreme Court said:

> The whole tenor and spirit of his conduct, when he found himself thus embarrassed, is marked not by a disposition to be guilty of a contempt of the jurisdiction of any court but disclosed a courteous and respectful consideration for each of them. *Id.,* at 781-782.

The memorandum analogizes the *Wise* case to this case, saying that Mr. Thomson made a subsequent arrangement to attend a prosecutor's seminar "during the same week as the previously scheduled Brinklow hearing." Unlike *Wise*, in which the defense attorney thought he could *finish* the first case and be present for the second case, Mr. Thomson knew full well he could not be both places at once -- the day of the Brinklow case was the first day of the seminar in San Francisco, California, somewhat different from being in two Courts in the City of Richmond. Moreover, no Judge forced him to attend the seminar as the first Judge did in refusing to release Wise to attend the second trial.

Mr. Thomson also compares the *Wise* case by indicating that when he called Mr. Louthan to indicate he "might need a continuance" and that he *would call back* if he was going to be absent, he showed a consideration for the affected parties; the attorney in the *Wise* case actually called opposing counsel to ask the Court for the continuance, which opposing counsel did prior to the hearing of the case. Mr. Thomson admits he did not call Mr. Louthan back but says he asked Mr. Massie to call Mr. Louthan and then ask the Court for a continuance the morning of the trial. The Court doubts that this was done because Mr. Massie testified that he did not remember being so requested, nor did he see the telephone number of Mr. Louthan on his instruction sheet, which Mr. Thomson said he placed there. He did not deny Mr. Louthan's testimony that he had asked him if he was going to call the Judge as well.

The Court does not doubt Mr. Thomson's sincerity in testifying that he put the numbers on the sheet or told Mr. Massie to call; however, it believes this is only what he *thought* he did after he learned of the difficulty. The Court finds from the evidence that he did not request Mr. Massie to call Mr. Louthan.

The further contention is that he "prepared his senior associate for his scheduled court appearances and in particular the Brinklow hearing." However, the arrangement was Mr. Massie would first ask for a continuance, and failing to get that, then he would ask for appointment as Mrs. Brinklow's counsel. However, when Mr. Massie asked for the continuance and the Court indicated it could not be granted because there was no justification for it and Mr. Massie then offered to act as counsel, he responded to the Court, when questioned as to whether he knew anything about the case, that he was unfamiliar with the case and not prepared to try it, admitting that he had never talked to the client nor had the client been consulted about the change in counsel. The Court concludes from this that Mr. Thomson had not in any meaningful way prepared Mr. Massie or the client for Mr. Massie's representation, and the Court believes this demonstrated a unilateral determination that he would attend the seminar no matter his obligation to the Court, certainly a far cry from a "courteous and respectful consideration for the court," as described in the *Wise* case.

In *Wells v. Commonwealth*, 62 Va. (21 Gratt.) 500 (1871), an attorney had advised his client to move the bankruptcy court for an injunction preventing the sale of his exempt property by a State Court. When the attorney was cited for contempt of that court, he filed an affidavit indicating it was his good faith belief that his client did have such a right under the law and he intended no disrespect or contempt of the State Court. The Supreme Court held that even though he may have been mistaken in his judgment, if he did have that good faith belief and intended no disrespect to the Court, he could not be found guilty of contempt and reversed the trial court in its so finding.

*Wells* should be considered from the aspects of Mr. Thomson's asserted ignorance of the fact that counsel engaged by a client to try a case cannot transfer that

personal responsibility to other counsel without the client's consent. Section 133, *Attorneys at Law*, 7 Am. Jur. 2d 198. He says he relied upon a "local custom" of substituting trial counsel, but upon questioning, merely referred to the practice he and Mr. Massie had engaged in in the past. The Court doubts that they ever did it without at least consulting the client, something conspicuously absent in this case.

We are not told whether the firm or the lawyer personally was retained or whether the clients had agreed to the substitution of counsel in those cases referred to in the supplemental memorandum of March 12, 1986, quoted from Section 3(b) of 13 ALR 4th 136. The Court does not have ready access to the out-of-state cases. The available cases are summarized below:

*In re Marshall*, 423 F.2d 1130 (5th Cir. 1970). In this case, it is not stated whether Mr. Marshall was personally retained or whether the other lawyer was an associate; obviously, his client knew of the change of counsel and must have agreed to it since he talked to her (and the Court's secretary) before seeking out the witness and sending other counsel to the trial while doing so.

*Thompson v. State*, 427 So. 2d 341 (Fla. App. 1983), was a case where the lawyer told his client he may not be back from a trip to a foreign country for the trial when he first undertook representation. The client testified that "when Mr. Thompson agreed to the representation, he had explained there was a possibility he would not be in town for the trial, but that either he or Adkinson [his partner] would be available throughout the case" (*id.*, at 342), but apparently, the client changed his mind and refused to agree to the substitution. The Court held that Thompson had no reason to believe Adkinson would be unable to cover the case as they had arranged.

Both these cases showed at least client knowledge and apparent acquiescence, if not consent. This Thomson case is devoid of any of that, and the Court finds it hard to believe that any reasonable person, whether a lawyer or not, could have believed that lawyers could be so cavalierly switched without the client's knowledge, especially when she stands to lose her child at the trial.

The Court does note the fact that Mr. Thomson was commendably *pro bono* on this appeal and that he was to be appointed indigent counsel when indigency was established at the trial. However, he did agree to act as Mrs. Brinklow's counsel when the case was set for hearing at Motions Day on October 22nd and realized that opposing counsel, the guardian *ad litem*, any necessary witnesses, and the Court would be planning to try the case that day. Further, at that time, the Court stressed to all counsel, including Mr. Thomson, the importance of a trial to resolve the status of the infant involved, which the Court said then had been too long delayed, necessitating this trial on a holiday.

Giving Mr. Thomson the benefit of the doubt and assuming a good faith belief that he could substitute trial counsel without his client's consent, the Court finds that he could not have believed that Mr. Massie was prepared to try the case (as the substitute lawyer was in *Thompson v. State, supra*) or that the Court would have permitted the substitution in this case. The sequence of the planned presentation belies any substantial belief that Mr. Massie was prepared; he was *first* to ask for a continuance and then, if it was denied, offer to act as counsel. Mr. Massie said to the Court the morning of the trial and in his affidavit that he "was not very familiar with the case." The Court distinctly recalls his telling the Court that morning that he was not prepared to try the case, to which the Court responded that it believed any appellate court would set aside any finding against Mrs. Brinklow if the case was tried that day, and in any event, Mr. Massie and Mr. Thomson might be in a difficult position with Mrs. Brinklow.

Thus this case does not contain those elements of good faith mistake present in *Wells* or *Thompson*. While Mr. Thomson arguably might have made a good faith error of law in assuming he could transfer trial responsibilities, the facts clearly demonstrate that he could not have been mistaken in his belief that counsel virtually unprepared for trial could be an acceptable substitute.

*Harvey v. Commonwealth*, 209 Va. 433 (1968), was a case in which the lawyer initially advised the court she represented a person who was one of a group of 371 people charged with violation of an injunction involving

racial demonstrations. The case was delayed for more than three years, and when it was finally set for trial, she told the court that she did not represent him, although about a week before, she had reaffirmed the fact that she did still represent him and he would be present in court for the hearing. She explained the change in position by the fact that she had never directly contacted the client and simply assumed that she would represent him based on his statement three years before and her contacts with his family, but when he did not show up for the trial, she felt that she did not have the authority to represent him. The Supreme Court reversed the trial court, which found her guilty of contempt in failing to be frank with the trial court. The Supreme Court said that there was a reasonable basis for both of her statements and neither were untrue nor calculated to mislead the court, and therefore, she could not be guilty of contempt.

This case does not involve a question of misrepresentation as in *Harvey*, it involves a failure to appear pursuant to an order fixing the case for trial. The helpful annotation "Attorney's Failure to Attend Court," 13 ALR 4th 122 cited by Mr. Thomson's counsel is illustrative of that problem:

> Delinquent attorneys have offered a wide variety of excuses for their absences, which the courts have accepted or rejected depending upon the particular facts of the case. The most common explanation has been that the attorney had incurred a conflicting obligation to appear before another court, or had other pressing legal business which made it impossible to attend the proceeding as scheduled. Here, as in other circumstances, the court's decision has sometimes appeared to rest on such factors as whether the attorney had a history of such absences, whether he had notified the court of his inability to attend in time for it to make other arrangements, or had provided substitute counsel who was prepared to handle the case, or simply whether or not it believed his story. *Id.*, at 126.

The following are the cases noted in the annotation where contempt was found because of the attorney's failure to show up for trial.

Where the attorney knew in advance that he had a conflict and failed to advise the court until the morning of trial of that conflict, *United States v. Smith*, 436 F.2d 1130 (9th Cir. 1970), cited on page 130.

*Re Shorter*, 236 A.2d 318 (D.C. App. 1967), noted on page 132, was one in which the lawyer had a number of conflicting court engagements and did not show up at the scheduled hearing because of those conflicts, but he never notified the judge of the conflicts and had no justification for not doing so.

*In re Hunt*, 367 A.2d 155 (D.C. App. 1976), noted on page 132, where the lawyer was seven minutes late to court and his excuse was he was trying to re-schedule another case and it took longer than he thought, the court said that his failure to notify the court of the delay indicated that he had deliberately substituted his own judgment for a direct order of the court, although it was in a good faith effort to resolve a conflict.

A failure to notify the judge because of a scheduling conflict making the attorney late for court was found, *In re Gratehouse*, 415 A.2d 1388 (D.C. App. 1980).

*People v. Adam*, 304 N.E.2d 711 (Ill. App. 1973), noted on page 134, where the attorney did not show up for a trial and never notified the court that he was absent because he was involved in another trial in the same building. The argument was that his conduct had not been shown to be "willful, an essential element of the finding of contempt," but the court said he had ample opportunity to notify the court of his intention if he was in the same building all during that day.

In *Murphy v. State*, 416 A.2d 748 (Md. App. 1980), noted on page 134, a defense attorney failed to appear for trial because of a conflicting trial, and he claimed he called one judge in the court system to advise he could not attend a scheduled preliminary hearing, and he assumed that judge would inform the trial judge and that he also told his secretary to notify the trial judge and she did not follow through. The court rejected his explanation as an attempt to place the blame on others. The court stated that the responsibility for seeing that

notice was provided was the attorney's, not his secretary's or the prosecutor's, whom he had talked to the day before and indicated that the continuance would be no problem. The attorney tried to rely on a previous case, which held that where an attorney simply forgot the trial and was confused on the dates and preoccupied with another case, he could not be found guilty of a willful contempt since he lacked specific or general intent and had never previously failed to appear. The *Murphy* court distinguished it on the ground that this was a reckless disregard of the attorney's professional duty.

There is no evidence of a history of prior absence by Mr. Thomson, but the other criteria enumerated at 13 ALR 4th 122 should be considered:

(1) Whether Mr. Thomson notified the Court of his inability to attend in time for it to make other arrangements.

Mr. Thomson says he did not do any more than look at the phone book to see that the Judge had no listed telephone. He did not call the police or the Clerk to see if they could locate the Judge, nor did he instruct Mr. Massie to notify the Court on Saturday or Sunday. The Court believes that he really did not want to talk to the Judge and run the risk that the Court would refuse to continue the case; if he had wanted affirmative relief, he could have gotten the Judge through the Clerk or the police even on Sunday, as attorneys do if it is sufficiently important to them or their clients.

Obviously, neither the Court nor other counsel could have done much to rearrange their schedules on one or two days' notice, but the Court might have prevented the absence and resulting continuance if notified in advance of the plan.

(2) Whether he had provided substitute counsel who was prepared to try the case.

For reasons discussed, the court does not believe he had done so.

(3) Whether the Court believed his story.

The Court believes that Mr. Thomson decided it was more important for him to go to the seminar than to try the case and chose not to ask the Court for a continuance because he knew it would not be granted; the Judge had already stressed the urgency of the trial. He also knew

that Mr. Massie could not be expected to give his client the representation she needed and expected and that the case would have to be continued even if the Judge found there were no grounds therefor. I have no personal doubt that Mr. Thomson *now* believes he told Mr. Massie to do certain things, but I do not believe that he did at that time, and that when he left, he knew his unilateral decision not to appear would be a surprise to all concerned, mandating a continuance.

As I have said in these hearings, none of this diminishes my personal respect for Mr. Thomson; indeed, if I consulted only my personal feelings, I would conclude this case with a warning but not a finding of contempt. However, I cannot do that consistent with my obligation to the judicial system and the affected parties, especially this young infant and others whose cases will be set for trial in the future. We insist the jurors and witnesses attend trials as and when scheduled and punish them for contempt if they fail to do so without good cause. Certainly we can do no less in dealing with the officers of the Court who unilaterally and without notice decide they will not honor a prior Court commitment but rather attend a subsequently arising event not requiring their presence.

In summary, the court finds beyond a reasonable doubt that Mr. Thomson was in contempt of Court in failing to appear for the trial of the case. However, considering that he did go to a seminar which he felt better equipped him as a Commonwealth's Attorney and that this is the first instance it has happened, the Court modifies its original penalty from a $300 fine and five days suspended to a $300 fine.